UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NAJIBA ZAZAI,

         Plaintiff,

    v.

CAROLYN W. COLVIN,

         Defendant.

Case No. 15-cv-03591

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 17

       Plaintiff Najiba Zazai seeks disability insurance benefits and supplemental security income due to her major depressive and generalized anxiety disorders.  In denying Zazai's claims for benefits, an Administrative Law Judge ("ALJ") relied on treatment records from monthly medication management visits to conclude that Zazai's symptoms were well controlled with medication and, therefore, not disabling.  However, the ALJ both mischaracterized the efficacy of her treatment and improperly discounted the longitudinal evidence provided by her primary treating physician demonstrating persistent debilitation in favor of the opinion of a non-examining physician.  In addition, the ALJ's credibility finding is not sufficiently specific because the ALJ failed to identify which portions of Zazai's testimony were not credible; the proffered reasons for discrediting Zazai's testimony were not supported by substantial evidence in the record.  As a result of these errors, I GRANT Zazai's motion for summary judgment, DENY the Commissioner's motion, and remand for further proceedings.

BACKGROUND

## I.  PROCEDURAL HISTORY

       On January 2, 2013, plaintiff Zazai applied for Title II Social Security Disability Insurance ("SSDI"), and on January 31, 2013, she applied for Title XVI Supplemental Security Income ("SSI"), alleging an onset of disability of October 1, 2010.  Administrative Record ("AR") 153-62; Exs. 1D, 2D.  Her claims were initially denied on May 3, 2013(AR 97-101) and denied on reconsideration on December 5, 2013.  AR 103-09.  She filed a written request for an ALJ hearing and on September 16, 2014, a hearing was held before ALJ Michael Blume.  AR 26.  On

1   December 16, 2014, the ALJ issued an unfavorable decision and concluded that Zazai was not

2   under a disability within the meaning of the Social Security Act from October 1, 2010 through the

3   date of his decision.  AR 9-25.  The ALJ's decision became final when the Appeals Council

4   denied Zazai's request for review.  AR 1-3.  Zazai filed this action on August 5, 2015.  Currently

5   before me are the parties' motions for summary judgment.  Dkt. Nos. 16, 17.

6   **II.  ZAZAI'S BACKGROUND AND IMPAIRMENTS**

7          Zazai is a 41-year-old woman from Afghanistan and the mother of four children.  AR 482,

8   391.  She had a traumatic childhood--she grew up in a war-torn country, experiencing frequent

9   bombings, violence, and death.  AR 392.  Both her father and sister died during the war, and her

10  cousin committed suicide after getting "mentally sick from the war."  *Id.*  As an adolescent, Zazai

11  was hit by shrapnel over her eye and almost died from the injury.  *Id.* Her family eventually fled to

12  Pakistan and settled there.  *Id.*  As a result, she was forced to leave school in "seventh or eighth

13  grade"[1] and never completed her education.  AR 30, 392.  Zazai is concerned the war in

14  Afghanistan will never end and fears the loss of more family and friends.  AR 482.  She remains in

15  contact with her friends and family in Afghanistan; bad news of the war increases her depression.

16  AR 482.

17         In 2012, about two years after coming to the United States, AR 31, Zazai enrolled in

18  English classes, but dropped out after a few months due to poor motivation and impaired memory.

19  AR 31, 394.  She claims she forgot most of the little English she learned. AR 31.  A consultative

20  examiner found that she was able to speak in "simple sentences." AR 393.  On her disability

21  report, Zazai indicated that she cannot read or write English.  AR 191.

22         From 2007 to 2010, Zazai worked as an in-home care aide for approximately 20 hours per

23  week.  AR 181-86, 193-94.  She states that she had to stop working in October 2010 because of

24  her deteriorating mental health, including her memory impairments. AR 37- 38.  She says that she

25  stopped working as an in-home care taker in part because she was concerned for her clients' safety,

26

27  _____

28  [1] The record has conflicting evidence about when Zazai's schooling ended.  *See, e.g.*, AR 392
    ("grade ten"); AR 193 ("3rd grade"). Her husband explained the discrepancies to a consultative
    examiner as due to the fact that "dates and ages is not a construct used in Afghanistan." AR 394.

United States District Court
Northern District of California

1    that she was afraid that she might give them the wrong medication.  *See also* AR 193, 392.

2         Zazai testified that when she feels sad, she wants to be left alone and isolates herself in a

3    room. AR 42, 43, 394.  On good days she is able to cook, clean, and care for her children.  AR 42.

4    She says that the number of good days she has fluctuates greatly, ranging from one day a week to

5    four days a week.  AR 33 (testifying she had 2-3 good days a week); AR 44 (testifying that

6    number of good days fluctuates between one and four a week).  Her husband largely cares for their

7    children.  AR 394.  She testified that she tries her best to take care of her children, but cannot

8    when not feeling well.  Her husband cooks and cleans, but she will also cook when feeling well.

9    AR 394; *but see* AR 391 (she forgot that she warmed milk and almost started a fire); 478 (forgets

10   to turn off the stove).  Her husband takes care of the children in the morning, and when her eldest

11   daughter gets home from school (her husband works in the afternoons), the daughter takes care of

12   her and the younger children.  AR 33.

13        Zazai says that sometimes she can go out alone to Safeway or drive, but is scared of

14   strangers and concerned that she will forget where she lives. AR 34-35.  She drives occasionally

15   to pick up her kids when she is a "little bit okay," and won't otherwise drive alone except in

16   emergencies.  *Id.*  At the ALJ hearing she testified that her condition has gotten worse since 2010,

17   and that her prescribed medication helps her feel more relaxed. AR 38-39.

18        Zazai alleges a disability onset date of October 1, 2010.  AR 153, 155.  In February 2011,

19   she complained of insomnia, stress, memory problems, and crying spells to Dr. Shaista Shah, her

20   primary care physician at California Cardiovascular Consultants.  AR 256.  Dr. Shah diagnosed

21   Zazai with Depression, prescribed Prozac and Ambien, and referred her for mental health

22   treatment.  AR 257.  Dr. Shah has also treated Zazai for certain physical ailments that are not at

23   issue now.[2]

24        Zazai is a regular patient at Alameda County Behavioral Health Care Services.  She began

25   weekly psychotherapy session in October 2012 with clinical psychologist Dr. Kambiz Sakhai.  *See*

26   AR 476-578.  On November 1, 2012, Dr. Sakhai diagnosed Zazai with "Major Depressive

27

28   _____
     [2] Dr. Shah diagnosed Zazai with hypothyroidism and treated her for right knee pain.  AR 290.

United States District Court
Northern District of California

Disorder, Recurrent, Severe With Psychotic Features." AR 370-73, 457, 476. Dr. Sakhai described the psychotic features as "voices" in Zazai's head telling her "you will lose all your family." AR 482. In the treatment plan dated November 1, 2012, Dr. Sakhai noted that Zazai "continues to suffer from lack of trust in others, crying spells, depressed mood, and anhedonia on a daily basis." AR 478. Dr. Sakhai also noted that Zazai "forgets to turn off the stove or [lock] the door at all times." *Id.*

In her psychological evaluations on March 14, 2013 and September 9, 2013, Dr. Sakhai noted that Zazai's "severe depression" continued and that her current symptoms included severe memory loss, inability to concentrate, depression, apathy, inappropriate guilt, sense of worthlessness, and sleep disturbances. AR 370-73, 454-56. Dr. Sakhai indicated that Zazai must be reminded of her appointments or else she fails to remember them. AR 370, 454. In March 2013, Dr. Sakhai again reported that Zazai exhibited psychotic symptoms, including visual and auditory hallucinations, which began soon after her depression started. AR 370. Dr. Sakhai explained that Zazai's depression and the voices in her head make it very difficult for her to follow and understand instructions. AR 372, 456. She also reports that Zazai is unable to keep regular attendance and schedules due to her memory loss, and requires attention at home. AR 373, 456. In September 2013, Dr. Sakhai concluded that Zazai's depression "worsened when she realized that she was not able to hold a job because of her condition." AR 454. According to Dr. Sakhai, Zazai's depression stems from painful memories of the war in Afghanistan and "unfinished mourning for the lost love[d] ones . . . [which] have turned into severe depression and have disabled [t]he patient." AR 454.

In her treatment plan dated March 2013, Dr. Sakhai noted that Zazai's symptoms were improved but that despite Zazai's medications, she continued to suffer from severe sleep disturbances, problems with her memory and concentration, and social isolation. AR 503. Dr. Sakhai confirmed that Zazai is taking medication to prevent worsening of her symptoms and must continue treatment "to not deteriorate symptoms and to not get hospitalized." AR 503.

In a Medical Source Statement dated February 19, 2014, Dr. Sakhai opined that Zazai's ongoing impairments would cause her to miss work more than 3 times a month, and that her

United States District Court
Northern District of California

1    capabilities of performing the following activitie are at an "extreme loss": to understand and

2    carryout very short, simple instructions; to maintain attention and concentration for 2-hour

3    segments; to maintain regular attendance and be punctual; to deal with stress of semi-skilled work;

4    and to be aware of normal hazards and take appropriate precautions.  AR 603-05.  In addition, in

5    an evaluation dated February 24, 2014, Dr. Sakhai found that Zazai has extreme functional

6    limitations, including continual "[e]pisodes of deterioration or decompensation in work or work-

7    like settings which cause the individual to withdraw from that situation or to experience

8    exacerbation of signs and symptoms" and that she has constant "deficiencies of concentration,

9    persistent, or pace resulting in failure to complete tasks in a timely manner."   AR 605.

10          Dr. Sakhai's late 2013 and 2014 weekly progress notes indicate Zazai continued to suffer

11   from her depression and anxiety through July 2014.  *See, e.g*., AR 512, 513, 519, 525 (November

12   and December 2013 and January 2014 notes reporting Zazai felt down and depressed most days

13   prior week); AR 608-09, 611, 615, 623 (March, April, May and June 2014 notes reporting

14   continued depression, severe sleep disturbances, irrational guilt, tearful affect, agitation, and low

15   moods).  In Dr. Sakhai's March 2014 progress note, she reported that Zazai was not interested in

16   communicating or connecting with her and described her as apathetic, nervous, and agitated. AR

17   622-23.  In April 2014, Dr. Sakhai described incidents of lack of self-confidence and low self-

18   esteem, and how Zazai was in tears and "could not elevate her mood at all during the last week."

19   AR 618-19.  In May 2014, Dr. Sakhai's progress notes show that Zazai reported severe sleep

20   disturbances, felt "down and depressed," had feelings of irrational guilt, and increased lack of

21   energy and motivation throughout the week.  AR 609, 611, 613, 615.  In a progress note dated

22   June 4, 2014, Dr. Sakhai reported that Zazai felt "down and depressed most of the days." AR 608.

23          In a Mental Impairment Questionnaire from July 2014, Dr. Sakhai again concluded that

24   Zazai was severely depressed with a high level of anxiety, despite taking medications and coming

25   to weekly therapy sessions.  AR 630.  Dr. Sakhai, again, opined that Zazai's cognitive ability,

26   memory and mental processing are "severely impaired" and that these severe limitations would

27   last at least 12 months.  AR 630-35.

28          At the request of Zazai's social worker, Zazai saw Dr. Abraham, a psychologist, who

5

examined her one time on June 10, 2013. *See* AR 390-98. Dr. Abraham also diagnosed Zazai with Major Depressive Disorder and characterized her disorder as Recurrent and Severe due to the "debilitating symptoms that interfere with her ability to function effectively in occupational and social arenas." AR 396. Dr. Abraham indicated that Zazai's depression surfaced in childhood as a result of her traumatic childhood and loss of family members and that she also had a genetic predisposition to depression given her mother and grandmother's history of depression. AR 396. According to Dr. Abraham, Zazai has passive suicidal ideation, although Zazai reports that she would "never do that" as it is against her religion. AR 393. Dr. Abraham also reported that she suffers from exhaustion and severe lack of motivation and concentration, and that she exhibited compromised hygiene due to her failure to bathe. AR 394-97.[3]

Zazai has also been a regular patient at Pathways to Wellness Medication Clinic for psychiatric medication management. She began monthly visits with Dr. Rim Said in October 2012, and with Dr. Pradeep Kumar in September 2013. AR 422-38, 579-601. These treating psychiatrists diagnosed Zazai with Major Depressive Disorder and Generalized Anxiety Disorder. AR 424-38, 582-87, 590-91. Her treatment records from October 2012 to February 2014 show that Zazai's symptoms fluctuated, with periods of improvement followed by recurrent symptoms of depression, anxiety, and panic. *See* AR 424-31, 582-87, 590-91, 593, 594, 599-600.

In his initial assessment in October 2012, Dr. Said reported that Zazai's symptoms included feeling helpless, hopeless, having no energy, being unable to concentrate and make decisions, having pressure in her chest, feeling constantly scared, and preferring to stay in a dark room. AR 422-43, 436. Dr. Said also reported thatZazai suffered from fainting attacks and had poor attention and concentration. AR 433, 601. According to Dr. Said, Zazai kept asking about a "strong" medicine to feel better. AR 435. In December 2012, Dr. Said found Zazai's judgment was "fair" and noted that her mood was sad, she had trouble breathing, and felt angry at times.

---

[3] A DDS psychological consultant, Dr. Solomon, reviewed Zazai's records on November 22, 2013 and concluded that Zazai's mental impairments are not severe. AR 90. According to Dr. Solomon, Zazai appeared to be "adjusting" and not "floridly psychotic" since she is not suicidal. *Id*. Dr. Solomon suggested that her depression is reflective of adjustment issues and "heavily influenced by situational factors," namely her "coping" with young children, and relied heavily on the fact that Zazai was able to work "even after war experiences." *Id*.

United States District Court
Northern District of California

AR 594.  In February 2013, Dr. Said reported on Zazai's continued feelings of depression, trouble sleeping, poor concentration, and a sad affect.  AR 592-93.

Dr. Said's progress notes from March to May 2013 indicate an improvement in Zazai's symptoms.  *See* AR 426-31.  In March, Zazai reported that she felt better on Cymbalta, and Dr. Said noted that her depression was "partially improved" with a "fair" prognosis.  AR 430-31.  In April, Zazai stated that she "feels good when she takes the medicines" though there were indications of residual depression.  AR 428-29.  In May 2013, Dr. Said reported that Zazai still has problems sleeping but described Zazai as "stable[,]" and feels better on Wellbutin, indicating that her prognosis was "good."  AR 426-27.

Zazai returned to see Dr. Said two months later in July 2013, and the progress note indicated that her prognosis had worsened to "fair[,]" that she had memory problems (indicated by her failure to take her medication sometimes, but that she remembers when "she feels sad"), and that she wakes up 2-3 times a night.  AR 424-25.  Dr. Kumar's progress notes over the next six months until January 2014 show that Zazai remained depressed, with symptoms of anxiety, panic, and insomnia.  AR 584-85, 586-87, 590-91.  In January 2014, Dr. Kumar said that Zazai's prognosis worsened to "still poor" and that she still has symptoms of depression, was unable to sleep at night, and had a sad and anxious mood.  AR 584-85.  However, in February 2014, another improvement her symptoms was noted in Dr. Kumar's progress note, which indicated that Zazai was "doing very well" with her current medication and that her "[d]epression is under control."  AR 582-83.

With the exception of one progress note in September 2013, Drs. Said and Kumar assigned GAF scores of increasingly greater levels of functioning ranging from 40 to 60 from October 2012 through February 2014.  *See* AR 436, 592, 430, 590, 428, 426, 424, 586, 584, 582, 600. [4]  In September 2013, Zazai's GAF decreased from 60 to 50, and then increased to 60 in November 2013.  AR 424, 590, 586. [5]  Zazai's GAF score remained at 60 for her visits in January 2014 and

[4] Generally a GAF score of 60 shows "moderate limitations," and lower scores indicate more serious symptoms and limitations.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed.).
[5] Dr. Abraham, who only saw Zazai once as a consultative examiner, assessed her with a GAF of

United States District Court
Northern District of California

February 2014.  AR 584, 582.  Dr. Sakhai, who was meeting with Zazai on a weekly basis, gave Zazai a GAF of 41 in February 2014, and indicated that Zazai's GAF had never been above 50 in the last year.  AR 602.

## III.   DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B) (West 2004); *Hill v. Astrue,* 698 F.3d 1153, 1159 (9th Cir. 2012).

### A.  The Five-Step Inquiry

To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. sections 404.1520(a)(4)(i)-(v). In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)-(ii). At step two, an impairment must have lasted or be expected to last 12 months in order to be considered "severe." *Id.* § 416.909.  In addition, a "severe" impairment or combination of impairments significantly limits an individual's ability to perform basic work activities.  *Id.* § 416.920(c).  Conversely, an impairment or combination of impairments that is "not severe" within the meaning of the regulations is only a slight abnormality that has no more than a minimal effect on an individual's ability to work.  *Id.* § 416.921.

In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations. *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of the listed impairments, the ALJ must first

35 in June 2013.  AR 396.

United States District Court
Northern District of California

1 | determine the claimant's Residual Functional Capacity ("RFC") before proceeding to step four.

2 | *Id.* §§ 404.1520(e), 416.920(e).  This determination is made based on all the evidence in the

3 | record, including impairments that are not severe, and is used to evaluate the claimant's work

4 | capacity for steps four and five.  *Id.* § 416.920(e).

5 |       In step four, the claimant must establish that his or her impairment prevents the claimant

6 | from performing relevant work he or she did in the past.  *Id.* § 41 6.920(a)(4)(iv). The claimant

7 | bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to

8 | establish [his] entitlement to disability insurance benefits."  *Id.* (alterations in original).  Once the

9 | claimant has established this prima facie case, the burden shifts to the Commissioner to show at

10 | the fifth step that the claimant is able to do other work, and that there are a significant number of

11 | jobs in the national economy that the claimant can do.  *Id.* §§ 416.920(a)(4)(v),(g); 416.960(c).

12 |       In step five, significant jobs in the "national economy" must exist either "in the region

13 | where such individual lives or in several regions in the country."  42 U.S.C. § 423(d)(2)(A). There

14 | is no bright-line rule for determining how many jobs are "significant" under step five in the Ninth

15 | Circuit, although "a comparison to other cases is instructive."  *Beltran v. Astrue,* 700 F.3d 386,

16 | 389 (9th Cir. 2012). Moreover, there must be more than a few "scattered", "isolated" or "very

17 | rare" jobs available. *Walker v. Mathews,* 546 F.2d 814, 820 (9th Cir. 1976); *see also Gutierrez v.*

18 | *Comm'r of Soc. Sec.,* 740 F.3d 519, 529 (9th Cir. 2014).  Finally, even if there are not sufficient

19 | jobs in the regional economy, courts must still look to the availability of those jobs across several

20 | regions in the national economy.  *Gutierrez,* 740 F.3d at 528.

21 | **B.  The ALJ's Decision**

22 |       At step one, the ALJ found that Zazai has not engaged in substantial gainful activity since

23 | the alleged onset date of October 1, 2010.  AR 14.  At step two, which is at issue here, the ALJ

24 | found that Zazai did not have an impairment or combination of impairments that significantly

25 | limited her ability to perform basic work-related activities for 12 consecutive months.  AR 14.  In

26 | reaching this conclusion, the ALJ said that he "considered all symptoms and the extent to which

27 | these symptoms can reasonably be accepted as consistent with the objective medical evidence . . .

28 | ."  AR 15.  The ALJ engaged in a two-step process to evaluate the symptoms: (1) determine

United States District Court
Northern District of California

United States District Court
Northern District of California

1   whether there is an underlying physical or mental impairment that can be shown by medically

2   acceptable clinical and laboratory diagnostic techniques which could reasonably be expected to

3   produce the claimant's pain; and (2) once such an impairment is shown, evaluate the intensity,

4   persistence, and limiting effects of the symptoms to determine the extent to which they limit the

5   claimant's functioning.  AR 15.

6        The ALJ did not find Zazai's physical ailments – her hypothyroidism and knee pain –

7   sufficiently limiting.  AR 15-16.  As to her mental impairments, the ALJ discounted the medical

8   source statements of her treating clinical psychologist Dr. Sakhai, who concluded that Zazai's

9   impairments caused an "extreme" loss in the ability to perform a wide range of work-related

10  functions.  AR 17.  The ALJ determined that Dr. Sakhai's opinion was not substantiated by the

11  record because "[t]he treatment records indicate that . . . [Zazai] reported significant improvement

12  in symptoms with medication" since beginning her psychiatric assessments.  AR 16.  He found

13  that Dr. Sakhai's treatment notes were "cursory at best, and without documented mental status

14  examinations."  AR 17.  The ALJ also gave little weight to the assessment of Dr. Abraham

15  (consistent with Dr. Sakhai's diagnoses and concluding that Zazai's symptoms preclude her from

16  sustaining work) for similar reasons, namely that it conflicts with the reports of the treating

17  psychiatrists at Pathways to Wellness.

18       The ALJ relied heavily on the treatment records from Pathways to Wellness, which

19  according to the ALJ demonstrated an improvement in Zazai's symptoms since her October 2012

20  intake.  AR 17.  The ALJ specifically pointed to the March and April 2013 notes of Dr. Said

21  where Zazai reported feeling "much better" on Cymbalta (AR 16, AR 530), and that  Zazai's

22  insomnia issues were improving.  AR 17, 428.  The ALJ relied on the May 2013 notes where

23  Zazai reported feeling better on Wellbutin and Dr. Said indicated that she was "stable."  AR 17,

24  426-27.  The ALJ also relied on Dr. Kumar's February 2014 progress note showing that Zazai's

25  depression was "under control," AR 17, 582-83, and on the mental status examinations noting a

26  healthy appearance, cooperative attitude, linear thought process, no evidence of hallucinations,

27  good concentration and attention.  AR 17.  The ALJ did not, however, consider the periods of

28  depression that both preceded and followed progressions of improvement noted by the Doctors at

United States District Court
Northern District of California

1  Pathways to Wellness.  *See, e.g.*, AR 584 (January 2014: "still having symptoms of depression,

2  anxiety, and panic[,]" prognosis is "still poor"), AR 593 (February 2013: poor

3  attention/concentration, "seems to be more depressed & sad."), AR 590-91 (September 2013: still

4  feeling depressed).  The record does not include any treatment records after February 2014 from

5  Pathways to Wellness.

6       The ALJ found Zazai's testimony only "partially credible," although the ALJ did not

7  clearly identify which parts of her testimony he was referring to.  AR 16.  It appears that the ALJ

8  discredited Zazai's testimony that she stopped working in 2010 because of her worsening

9  depression and memory problems, and that she still suffers from memories of war and violence in

10  her country.  *See* AR 37-40.  He concurred with DDS psychological consultant Dr. Solomon, who

11  only reviewed Zazai's record.  *Id.*; AR 90. Dr. Solomon opined that Zazai's symptoms "are

12  heavily influenced by situational factors and largely reflect adjustment issues" because she was

13  able to work at a substantial gainful activity even after her traumatic upbringing in a war torn

14  country.  AR 16.  The ALJ also determined that any adjustment issues she may have are a result of

15  learning how to raise four children ages 11 and under.  AR 16.

16       Although he could have ended his analysis ends at step two (after finding no severe

17  impairment), the ALJ made "alternative findings" as to steps three to five.  At step three, the ALJ

18  alternatively found that Zazai's impairments did not meet the criteria for disability listed in the

19  administrative regulations.  AR 17-18.  The ALJ also concluded that the evidence demonstrates

20  "no more" than a "moderate limitation" due to Zazai's depression and anxiety disorder.  AR 18.

21  The ALJ found that Zazai had the RFC to perform "simple, repetitive tasks and occasional contact

22  with others."  AR 18.  In determining Zazai's RFC, the ALJ discussed the lack of objective

23  evidence in the record substantiating Zazai's claims for severe memory loss, difficulty

24  concentrating, and frequent inability to be around others.  AR 18.  The ALJ specifically pointed to

25  a lack of corroboration of Dr. Sakhai's report of Zazai's psychotic symptoms, as well as the

26  normal mental status examinations that reported linear thought processes and fair judgment from

27  Pathways to Wellness.  AR 18, 424-431.  The ALJ also relied on Dr. Kumar's progress note in

28  January 2014 that Zazai had an intact memory, and good attention and concentration, AR 18, 585,

587, as well as Zazai's statement that she was "doing very well" and that her sleep, appetite, and depression were under control.  AR 19, 582.

In finding that Zazai is limited to occasional contact with others, the ALJ considered her testimony that she isolates herself on bad days but, given her cooperative and calm demeanor during treatment visits, found that she is not precluded from all social interaction..  AR 18 (relying on Pathways to Wellness reports indicating her mood as "euthymic").

At step four, the ALJ alternatively found that Zazai is unable to perform her past relevant work as a home health aide.  AR 18.  The ALJ determined that Zazai is a "younger individual[,]" which is defined as an individual between the ages of 18 and 49.  AR 19; 20 C.F.R. §§ 404.4563, 416.963.  He also found that she is illiterate but is able to communicate with "rudimentary spoken English."  AR 19.

At step five, the ALJ's alternative finding relied on testimony of a vocational expert and determined that Zazai is capable of performing other jobs existing in significant numbers in the national economy.  AR 19.  The ALJ posed the following hypothetical to the expert:

> We have a hypothetical younger individual who is illiterate in English and speaks only rudimentary English with the same past work as the claimant who has no physical limitations but who's limited to simple, repetitive contact with occasional contact with others.

The vocational expert opined that she would be able to perform the requirements of representative unskilled occupations such as a palletizer with 333,000 jobs in the national economy, or a garment sorter with 233,000 national jobs.  AR 19-20.  The ALJ did not expressly include in the hypothetical to the vocational expert his alternate finding that Zazai had moderate limitations with regards to her depression and anxiety disorders.  In addition, the ALJ did not consider the additional testimony by the vocational expert, elicited by Zazai's counsel and based on Dr. Sakhai's RFC assessment, that "three to four unplanned absences per month" would "in and of itself close the world of work."  AR 46.

## LEGAL STANDARD

### I.    SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

United States District Court
Northern District of California

1   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

2   law." FED. R. CIV. P. 56(a).  In order to prevail, a party moving for summary judgment must show

3   the absence of a genuine issue of material fact with respect to an essential element of the non-

4   moving party's claim, or to a defense on which the non-moving party will bear the burden of

5   persuasion at trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has

6   made this showing, the burden then shifts to the party opposing summary judgment to identify

7   "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary

8   judgment must then present affirmative evidence from which a jury could return a verdict in that

9   party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

## II.      STANDARD OF REVIEW

11          Under 42 U.S.C. section 405(g), courts review an ALJ's decision to determine whether

12   substantial evidence supports the ALJ's findings and if they are free of legal error.  *See Smolen v.*

13   *Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir.

14   1991) (ALJ's disability determination must be supported by substantial evidence and based on the

15   proper legal standards). Substantial evidence means "'more than a mere scintilla,' but less than a

16   preponderance." *Saelee v. Chater,* 94 F.3d 520, 521-22 (9th Cir. 1996) (quoting *Richardson v.*

17   *Perales,* 402 U.S. 389, 401 (1971)).  Substantial evidence is "such relevant evidence as a

18   reasonable mind might accept as adequate to support a conclusion."  *Richardson,* 402 U.S. at 401,

19   (internal quotation marks and citation omitted).

20          When looking for substantial evidence, courts must review the record as a whole and

21   consider adverse as well as supporting evidence.  *See Robbins v. Soc. Sec. Admin.,* 466 F.3d 880,

22   882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the

23   ALJ's decision must be upheld.  *See Morgan v. Comm'r of the Soc. Sec. Admin.,* 169 F.3d 595,

24   599 (9th Cir. 1999).  "However, a reviewing court must consider the entire record as a whole and

25   may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins,* 466

26   F.3d at 882 (quoting *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir. 1989)); *Orn v. Astrue,* 495

27   F.3d 625, 630 (9th Cir. 2007).

28

**DISCUSSION**

Zazai challenges several of the ALJ's conclusions:  (i) the finding at Step Two that plaintiff has no severe impairments; (ii) the rejection for insufficient reasons of the opinions of Zazai's treating and examining sources; (iii) the failure to provide specific, clear, or convincing reasons for rejecting Zazai's subjective testimony; (iv) the lack of substantial evidence for the alternate RFC; and (v) the alternate Step Five finding's reliance on vocational expert testimony. Each argument will be addressed in turn.

## I.      THE ALJ ERRED AT STEP TWO

The ALJ's finding that Zazai has no severe impairments at Step Two is not supported by substantial evidence.  Where an adjudicator is "unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end [at step two]."  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).  Step two, then, is "a de minimis screening device [used] to dispose of groundless claims."  *Id.*  However, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

The Commissioner argues that the ALJ's determination was correct and that the ALJ appropriately relied on mental status examinations demonstrating the efficacy of treating Zazai's anxiety and depression with medication.  Defendant's Motion for Summary Judgment [Dkt. No. 17], at 2-5.  The Commissioner notes the ALJ's reliance on treatment records from the Pathways to Wellness Medication Clinic indicating Zazai's depression and anxiety disorders improved with medication and that her GAF improved over time.  For example, Zazai reported feeling "much better" on Cymbalta during her visit in March 2013, said that she "feels good when she takes the medicines" in April 2013, and that she also feels better on Wellbutrin in May 2013.  AR 430-31, 428-29, 426-27.  In contrast, plaintiff argues that while the Pathways to Wellness records document some improvement of symptoms, taken as a whole and looked at in full, the record shows that her symptoms nevertheless persisted, the level of her depression and ability to cope with her symptoms fluctuated, and the symptoms continued to interfere with her functioning.

Plaintiff's Reply Brief [Dkt. No. 18], at 2-3.

The ALJ's determination that Zazai's depression and anxiety are sufficiently controlled is not supported by substantial evidence. See, e.g., *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (a claimant will not be disabled where the "severity of the problem had decreased sufficiently to enable [her] to engage in gainful activity."). While Sasai's symptoms stabilized (or at best showed some temporary improvement) once she was on medication, the record nonetheless shows that serious symptoms of depression and anxiety persisted and, occasionally, worsened. For example, Dr. Said reported at a medication visit in July 2013 that her prognosis worsened from "good" to "fair," that she still exhibited memory problems (since she forgot to take her medication at times, but remembered when she felt sad), and continued to wake up 2-3 times a night. AR 424-25. He also described daytime sleepiness and found that her judgment was only "fair." AR 425. In addition, treating physician Dr. Kumar reported that Zazai was still feeling depressed and had a "sad" and "anxious"' mood in a progress note dated September 2013. AR 590-91. He also noted that Zazai was having poor sleep, and feeling "hopeless and helpless," and described her concentration to be "fair." *Id.* At Zazai's next medication visit in November 2013, Dr. Kumar described her mood as "sad," noted that she "still feels depressed and [is] unable to sleep off and on," and stated that her prognosis remained "fair." AR 586-87. In January 2014, Zazai's prognosis worsened to "still poor," and Dr. Kumar reported continued symptoms of depression, anxiety, and panic. AR 584-85. These are all after plaintiff had been on medications and under treatment at Pathways to Wellness since October 2012. AR 422.

The ALJ failed to address the evidence of ongoing symptoms as well as her regressions/worsening symptoms noted within the Pathways to Wellness records. Nor did the ALJ address the contemporaneous records from Dr. Sakhai that indicated Zazai was still suffering from serious symptoms of her depression and anxiety disorders, even though the medicines helped stabilize her symptoms to some extent.

Moreover, Dr. Sakhai, Zazai's primary treating clinical psychologist, whom she saw once a week, opined that her impairments are severe enough to preclude her from sustaining work and

15

1   that while her medications help maintain her current level of functioning, she was nonetheless still

2   "severely" limited.  AR 373, 603-05.  In February and July 2014, Dr. Sakhai said that the claimant

3   was still at an "extreme loss" in understanding short, simple instructions, maintaining attention for

4   more than 2-hour segments, and working in coordination with or proximity to others without being

5   unduly distracted.  AR 603-05, 630-35.  Dr. Sakhai also reported an irritable mood, insomnia,

6   problems with memory and concentration, and "poor control over her impulses."  AR 603, 633.  In

7   more recent progress notes from May 2014 to June 2014, Dr. Sakhai noted "increased lack of

8   energy and motivation," lethargy, feelings of "irrational guilt," and a sad/depressed mood.  AR

9   608, 613, 615.  Because the ALJ "isolat[ed]" the periods of improvement from Pathways to

10   Wellness and did not address the contradicting evidence described above, the ALJ's decision is

11   not supported by "substantial evidence." *See Lingenfelter*, 504 F.3d at 1035.

12         The Commissioner relies on *Landa v. Astrue*, No. 1:06-CV-001037-SMS, 2008 WL

13   256567, at *8 (E.D. Cal. Jan. 30, 2008) *aff'd,* 333 F. App'x 280 (9th Cir. 2009) to argue that a

14   global assessment of functioning (GAF) score of 60 is not sufficient to support a finding of a

15   severe mental impairment.  Dkt. No. 17 at 3.  There, the court found that the claimant's GAF score

16   of 60-65 indicated "only mild symptoms or difficulty who was generally functioning pretty well,

17   or one with moderate symptoms or difficulties at best."  *Id.*  However, *Landa* is distinguishable.

18   Here, the Doctors at Pathways to Wellness assessed Zazai from a low of 40 to a high of 60 with at

19   least one regression.   AR 422-38, 579-601.  In addition,, neither the ALJ nor the Commissioner

20   discuss the significantly lower GAF scores assessed by Drs. Sakhai and Abraham.  Therefore,

21   while the ALJ could rely on the fact that plaintiff's GAF score had improved and was assessed at

22   60, that score still indicated (at best) "moderate" limitations.  He erred in ignoring the history of

23   regressions, the lower GAF's assigned by Drs. Sakhai and Abraham, as well as the evidence by

24   Pathways doctors showing Zazai continued to suffer significant symptoms of depression and

25   anxiety.  The ALJ's reliance on the GAF of 60 does not provide substantial evidence.

26         Dr. Kumar's indications that Zazai had good attention/concentration and intact memory in

27   January and February 2014 are not entitled to much weight.  AR 583, 585.  One-third of the total

28   mental status examinations from Pathways to Wellness fail to make *any* notation at all with

United States District Court
Northern District of California

16

regards to her memory or attention/concentration.  *See* AR 425 (July 2013); 427 (May 2013); 429 (April 2013); 431 (March 2013).  Where Dr. Kumar did make notations as to her attention and memory, he simply checked the relevant boxes on the progress report without providing any further explanation or notes.  *See Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (finding that the opinion of an examining physician who "merely checked boxes without giving supporting explanations are insufficient to outweigh the opinion of a treating physician").  It is not clear whether these assessments were based on objective testing.  On the other hand, Zazai's treating psychologist contemporaneously determined that Zazai had problems with memory and concentration, and was at an "extreme loss" in remembering locations and work-like procedures in February 2014.  AR 603-04.  In a July 2014 mental impairment questionnaire, Dr. Sakhai continued to opine that Zazai's cognitive ability, memory, and mental processing were severely impaired, and also reported difficulty thinking or concentrating.  AR 630-31.[6]

Finally, as discussed in more detail below, the ALJ's rejection of Dr. Sakhai's opinion and attempt to rely on a subset of the Pathways to Wellness records and findings to conclude that plaintiff's mental health diagnoses were not severe was erroneous.  The entire record must be considered "as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citations omitted) (internal quotation marks omitted).  The ALJ's Step Two determination is not supported by substantial evidence.

## II.   THE ALJ ERRED BY REJECTING THE OPINIONS OF THE TREATING AND EXAMINING SOURCES FOR INSUFFICIENT REASONS

Zazai also argues that the ALJ erred in assigning little weight to the medical opinions of Dr. Sakhai, Zazai's weekly treating clinical psychologist, and examining psychologist Dr. Abraham, both of whom concluded that Zazai's symptoms are debilitating enough to preclude her

---

[6] The ALJ's reliance on Dr. Kumar's notation that Zazai's thought processes have been linear and her judgment fair to conclude that Zazai could perform "simple, repetitive tasks and occasional contact with others" (AR 18) was misplaced for similar reasons.  There is no explanation of how Dr. Kumar made those "check box" assessments.

United States District Court
Northern District of California

from sustaining work.  Pl. Mot. at 10-12.  The Commissioner argues that the ALJ properly discounted their opinions because the severity of their assessments was inconsistent with mental status examinations, as shown by the Pathways to Wellness notes, and lacked sufficient objective support.  Def. Mot. at 5-6.

The Ninth Circuit has distinguished among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996).  In general, the opinions of treating medical sources are given the most weight, though an ALJ may reject such opinions when they are contradicted by another doctor by stating "specific and legitimate reasons" that are supported by substantial evidence.  *Lester*, 81 F.3d  at 830.  The opinion of an examining doctor is also entitled to special weight, though not as much as a treating source.  As with that of a treating source, a contradicted opinion of an examining doctor can only be rejected by providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*

If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the SSA considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician and the "nature and extent of the treatment relationship" between the patient and the treating physician.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

In this case, the ALJ's decisions to reject the opinions of treating clinical psychologist Dr. Sakhai and examining psychologist Dr. Abraham were not warranted.  The ALJ found that these opinions were unsubstantiated and contradicted by the notes from the treating psychiatrists at Pathways to Wellness (Drs. Kumar and Said), as well as non-examining source Dr. Solomon. But as discussed above, the opinions of Drs. Sakhai and Abraham are not inconsistent with records from Pathways to Wellness when viewed as a whole.  While the records from Pathways to Wellness show improvement with medication, they also corroborate the diagnosis of severe

United States District Court
Northern District of California

18

anxiety and depression by Zazai's treating psychologist. *See, e.g.*, AR 593 (can't sleep for a long time, continues to be depressed, poor attention/concentration); AR 586-87 (still feels depressed and unable to sleep); AR 584-85 (still having symptoms of depression, anxiety, and panic). While the ALJ pointed to improvements detailed in the monthly visit notes at Pathways to Wellness, he ignored the regressions noted by those same psychiatrists as well as their notes showing Zazai continued to suffer from significant symptoms from her depression and anxiety. AR 424-25 (July 2013 notes indicate ongoing problems with memory loss and insomnia); AR 590-91 (September 2013 notes that Zazai was still feeling depressed); AR 586-87 (November 2013 notes that Zazai still feeling depressed and unable to sleep); AR 584-85 (January 2014 notes reducing Zazai's prognosis to "still poor").

When viewing the records as a whole – other than a discrepancy in the GAF's assigned by the various doctors – the Pathways to Wellness records from monthly visits do not necessarily contradict, much less fully undermine, the opinions of Zazai's weekly treating clinical psychologist and examining psychologist Dr. Abraham.

In addition, though the ALJ found Dr. Sakhai's opinion "was not well supported," it still merits special weight pursuant to the specified factors identified in *Orn*. Dr. Sakhai has treated Zazai the longest--her progress notes span over two years--and their treatment relationship is significant because Zazai had psychotherapy sessions with her on a weekly basis. *See* AR 482-578. While the opinions of Drs. Said and Kumar also merit special weight, they did not see claimant as often, and their relationship to claimant was only to manage her medication. Dr. Said saw Zazai on a nearly monthly basis eight times, AR 424-31, 593-94, 599-600, and Dr. Kumar saw Zazai four times, AR 582-87, 590-91.

The ALJ improperly discounted Dr. Sakhai and Abraham's opinions as "contradictory" to Drs. Said and Kumar. To the extent they were contradictory (*e.g.*, the GAF scores, which were not discussed by the ALJ), the ALJ failed to state "specific and legitimate reasons" to give decreased weight to Drs. Sakhai and Abraham.

### III.   THE ALJ ERRED BY FAILING TO PROVIDE SPECIFIC, CLEAR, OR CONVINCING REASONS FOR REJECTING ZAZAI'S TESTIMONY

In evaluating the credibility of a claimant's testimony about her impairments, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citations omitted).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations omitted).  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (internal citations omitted).  If there is medical evidence of an underlying impairment, the claimant's testimony may not be discredited solely for the reason that there is a lack of objective medical evidence in support thereof.  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Vasquez*, 572 F.3d at 591. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Reddick v. Chater*, 157 F.3d at 722.  As the Ninth Circuit recently reemphasized, the ALJ must specifically identify inconsistencies between the claimant's testimony and the evidence in the record, because "[a] clear statement of the agency's reasoning is necessary because we can affirm the agency's decision to deny benefits only on the grounds invoked by the agency." *Brown-Hunter v. Colvin*, 806 F. 3d 487, 494 (9th Cir. 2015).

In this case, the ALJ found Zazai's testimony to be only partially credible, and concurred with the opinion of Dr. Solomon, a non-examining, psychological consultant.  AR 16.  Plaintiff argues that the ALJ erred with regards to Zazai's testimony by failing to identify with specificity which symptoms or limitations plaintiff testified about were not credible, or what evidence undermined those complaints.  Pl. Mot. at 13-18.

The ALJ did not specifically identify the portions of claimant's testimony that were discredited.  Zazai testified that she was happy to work, though she had to stop working in 2010

because she became weak, depressed, tired, and had memory problems, which she feared might endanger her clients.  AR 37-38.  She also testified that her condition worsened since she stopped working and that she can't sleep well because she has traumatic wartime memories that leave her feeling scared.  AR 39.   Zazai testified that she has both good and bad days, and that her good days fluctuated between one and four a week.  On good days, she can help take care of her children, though her husband is mostly responsible for the kids and housework.  AR 42. Sometimes she is able to drive, but she testified that she does so rarely and almost never on her own because she fears getting lost due to her impaired memory.  AR 35.  On bad days, ranging from two to six times a week, she cannot be around anybody and isolates herself in a room.  AR 43.

The ALJ implicitly rejected the above testimony because he found that Zazai's impairments are non-severe, causing "no more than mild limitations in activities of daily living . . . social functioning . . . and maintaining concentration."  AR 16.  In support, the ALJ cited the opinion of nonexamining physician Dr. Solomon, who opined that despite allegations of fear and depression related to wartime memories, Zazai was able to work as a care aide even after these experiences.  Dr. Solomon asserted that the symptoms of depression were "heavily influenced by situational factors and largely reflect adjustment issues."  AR 16.  Although the ALJ concurred, there is no support in the record for Dr. Solomon's conclusions.

Plaintiff relies on *Gallant v. Heckler*, 753 F.2d 1450, 1454 (9th Cir. 1984), which provides that a non-examining physician's opinion is "not substantial evidence when contradicted by all other evidence in the record."  I agree with plaintiff that Dr. Solomon's opinion is not sufficient to support the ALJ's claim that Zazai's symptoms are merely situational because his opinion is contradicted by those of her treating sources.  The treatment records from Dr. Sakhai and Dr. Kumar show that her longstanding diagnoses of depression and anxiety significantly limit her functioning level.  *E.g.*, AR 603-05 (extreme functional limitations); AR 584-85 (still having symptoms of depression, anxiety, and panic, prognosis "still poor").

The only other support the ALJ offers for his credibility finding is his statement that the Pathways to Wellness records "indicate that within the year following her initial psychiatric

United States District Court
Northern District of California

1 | assessments for treatment (October 2012), she reported significant improvement in symptoms with

2 | medication." *Id.* Reliance on this evidence of improvement must be qualified because the

3 | improvements fluctuated and did not fully control her significant symptoms of depression and

4 | anxiety. The ALJ only singled out portions of these records showing periods of improvement, but

5 | failed to adequately address the periods where her symptoms worsened again. *See* AR 590-91,

6 | 586-87, 584-85; *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (finding that the

7 | ALJ's negative credibility finding was not supported by the evidence where the ALJ selectively

8 | quoted from treatment records and cited no specific evidence to support his claim). The ALJ

9 | acknowledged that claimant's symptoms "wax and wane to some degree," AR 17, in arguing that

10 | her symptoms are well controlled with medicine. He offered no other evidence to reconcile the

11 | evidence showing both regression in progress and continued serious symptoms despite some

12 | improvement.

13   The Commissioner's position is that the activities to which Zazai testified, such as walking

14 | with others to the park and raising four children, are "inconsistent with a severe mental

15 | impairment, let alone disability." Def. Mot. at 8. However, under *Lingenfelter*, plaintiff "need

16 | only show that [her impairment] could reasonably have caused *some degree* of the symptom." *Id.*

17 | at 1036 (emphasis added). Here, it is more than reasonable that her enduring depression and

18 | anxiety caused *some* degree of the symptom.

19   Because the ALJ's credibility finding is not supported by substantial evidence, and the

20 | ALJ did not identify the discredited portions of claimant's complaints with specificity, I conclude

21 | that the ALJ's credibility determination was erroneous.

22 | **IV. THE ALJ'S RFC DETERMINATION IS ERRONEOUS**

23   An RFC that fails to take into account a claimant's limitations is defective. *Valentine v.*

24 | *Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). A claimant's subjective testimony

25 | as to her limitations may only be excluded from an RFC assessment if the ALJ provided clear and

26 | convincing reasons for finding that the alleged symptoms were not credible. *See Lingenfelter*, 504

27 | F.3d at 1035 (finding that the ALJ's RFC assessment was not supported by substantial evidence

28 | where the ALJ did not provide clear and convincing reasons for finding claimant's alleged pain

1    and symptoms not credible).  Because I have determined that the ALJ erred in discounting

2    plaintiff's own and her treating physicians' testimony, the alternate RFC determination is likewise

3    without support.

4          As noted above, even after the ALJ "assumed" that plaintiff's mental impairments are

5    severe, he nonetheless determined she had the RFC to perform "simple, repetitive tasks, with

6    occasional contact with others."  AR 18.   In setting that RFC, the ALJ discounted plaintiff's

7    allegations of severe memory loss, difficulty concentrating, and need to isolate, and instead relied

8    on "check box" treatment notes indicating plaintiff had linear thought and fair judgment.  *Id*.  The

9    ALJ also limited plaintiff to occasional contact with others, considering both her self-described

10   isolation and the physician notes that she was cooperative and calm.  *Id*.

11         The ALJ, however, wholly failed to explain how the "severe" mental limitations he

12   assumed would impact her RFC, other than the limited contact with others.  Similarly, while

13   discounting the degree of memory loss and concentration testified to by plaintiff (and supported

14   by her treating doctors' notes), the ALJ did not provide any reasoned explanation of how she

15   nonetheless retained the ability to perform "simple, repetitive" tasks.   Because the ALJ's

16   "alternative" RFC conclusion is based on the erroneous discounting of Zazai's and her treating

17   physicians' testimony and is not otherwise based on a reasoned explanation of the evidence, it is

18   not supported by substantial evidence.

19   **V.     THE ALJ ERRED AT STEP 5**

20         Plaintiff argues that the ALJ erred at Step 5 in two ways: (i) by not giving the VE a

21   complete hypothetical; and (ii) by relying on VE testimony that is inconsistent with the DOT.

22         **A.   Incomplete Hypothetical**

23         Hypothetical questions posed to the vocational expert must set out *all* the limitations and

24   restrictions of the particular claimant.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)

25   (emphasis in original).  Plaintiff argues that the ALJ's reliance on the vocational expert's

26   testimony was erroneous for three reasons.  Pl. Mot. at 22.  First, the hypothetical does not include

27   all of her limitations because it reflects an inaccurate RFC and misstates her vocational ability.

28   Second, plaintiff distinguishes between a claimant who speaks "simple English" and one who

1    speaks only "rudimentary English."  She points out that when the ALJ asked the VE about a

2    person who was "illiterate in English and speaks only rudimentary English," the VE testified that

3    there would be no work.  AR 45.  While the ALJ then asked the VE about someone who spoke

4    "simple English" and the VE indicated there would be "show and tell" work available, in his

5    written decision the ALJ went back to characterizing plaintiff as having "rudimentary"  spoken

6    English.  AR 19.  Third, the ALJ's explanation to the VE that plaintiff could speak "simple"

7    English is not supported by the record.  *Id.*  In opposition, the Commissioner argues that the

8    hypothetical included all the limitations of the RFC determination, and that the ALJ properly

9    characterized Zazai's ability to speak English.  Def. Mot. at 10.

10          Initially, I agree with plaintiff that the hypothetical misstates Zazai's vocational ability

11   because the RFC was defective, as discussed above.  As to plaintiff's additional arguments, with

12   respect to her proficiency in spoken English, plaintiff does not cite any cases or regulations that

13   explain the difference (if any) between "simple" and "rudimentary" spoken English.  However, the

14   testimony of the VE in response to the ALJ's question about an illiterate individual who spoke

15   only rudimentary English was clear; there would be no work.  AR 45.  The ALJ himself used the

16   same terms in his final order; finding that plaintiff is "illiterate (cannot read or write) in English,

17   but is able to communicate with rudimentary spoken English."  AR 19.  There is, therefore, a

18   discrepancy between the VE's testimony and the ALJ's reliance on it in his written order.  The

19   ALJ's belief as to the extent of plaintiff's ability to communicate in English should be clarified on

20   remand.[7]

21   **VI.    CONSISTENCY WITH DOT**

22          Plaintiff also challenges the ALJ's reliance on the VE's testimony that, she argues, was

23   inconsistent with the DOT.  Specifically, the ALJ relied on the vocational expert's testimony that

24   Zazai would be able to perform the job of a palletizer or a garment sorter, which plaintiff argues

25

26   _____

27   [7]  The record is generally unclear as to Zazai's ability to communicate in English.  While
     defendant argues that plaintiff testified at the ALJ hearing in English, plaintiff responds that
     plaintiff testified through an interpreter and only attempted to answer one question directly in
28   English without the help of her interpreter.  *Compare* Def. Mot. at 10 *with* Pl. Reply at 8 (citing
     AR 30).  The ALJ should clearly establish Zazai's ability to communicate in English on remand.

United States District Court
Northern District of California

require language level 2 and language level 1 respectively under the DOT.  Pl. Mot. at 23; AR 19-20.  According to plaintiff, those language levels require the ability to read and write in English above the skills of someone who is "illiterate."  Pl. Mot. at 23-24.  Because the ALJ did not ask the VE to explain this deviation, it was error for the ALJ to rely on the VE's opinion about available jobs.  *Id.* at 24.

Defendant does not dispute that the jobs identified by the VE require level 1 and 2 language abilities.  Instead, the Commissioner argues that the vocational expert testimony was not in conflict with the DOT because the DOT lists only "maximum requirements of occupations as generally performed," and a vocational expert may supplement these with more specific information.  Def. Mot. at 11.[8]  However, the record does not reflect that the VE made any "supplementation."

The vocational expert did not provide any "more specific" or particularized information as to the job listings to explain why an individual with Zazai's language limitations could perform them and, therefore, his testimony conflicts with the DOT.  The ALJ could not appropriately rely on that testimony.  *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) ("When there is an apparent conflict between the vocational expert's testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency. . . . The ALJ's failure to resolve an apparent inconsistency may leave us with a gap in the record that precludes us from determining whether the ALJ's decision is supported by substantial evidence.").

## VII.    REMAND FOR FURTHER PROCEEDINGS

Plaintiff argues that in light of the errors made by the ALJ here, remand for payment of benefits is warranted.  When reviewing courts find that an ALJ has erred, they typically follow the "ordinary remand rule," which states that courts should remand to the agency for additional proceedings where "the record before the agency does not support the agency action, . . . the

---

[8] The Commission also argues that any error was harmless because the ALJ properly found no severe impairments at Step 2.   As I have rejected the ALJ's Step 2 finding, the Step 5 error is not harmless.

1  agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate

2  the challenged agency action on the basis of the record before it." *Treichler v. Comm'r of Soc.*

3  *Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).  However, courts may depart from this practice

4  in "rare circumstances."  *Id.*

5       The Ninth Circuit has articulated a three-part standard for determining when departures

6  from the ordinary remand rule are appropriate.  Courts may remand to an ALJ with instructions to

7  award benefits when the following requirements are satisfied:  "(1) the record has been fully

8  developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has

9  failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or

10  medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ

11  would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995,

12  1020 (9th Cir. 2014); *see also Treichler*, 775 F.3d at 1101.  No further proceedings are necessary

13  where "it is clear from the record that a claimant is entitled to benefits" and "the record has been

14  developed fully and further administrative proceedings would serve no useful purpose." *Garrison*,

15  759 F.3d at 1019; *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

16       Here, while the ALJ has committed a number of errors, I cannot say that it is clear from the

17  record that the claimant is entitled to benefits and that further administrative proceedings would

18  serve no useful purpose.

19                                  **CONCLUSION**

20       Plaintiff's motion for summary judgment is GRANTED.  Defendant's motion for summary

21  judgment is DENIED.  The case is REMANDED for further proceedings consistent with this

22  opinion.

23       **IT IS SO ORDERED**.

24  Dated: May 6, 2016

25  _____

26  WILLIAM H. ORRICK
   United States District Judge

27

28